```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

--------------------------------x

JAVIER RODRIGUEZ,

                        :

          Petitioner,           <u>REPORT & RECOMMENDATION</u>

                        :

        -against-           04 Civ. 9692 (SHS)(MHD)

                        :

JOSEPH T. SMITH, Superintendent,
Shawangunk Correctional Facility, :

          Respondent.      :

--------------------------------x

**TO THE HONORABLE SIDNEY H. STEIN, U.S.D.J.:**

Petitioner Javier Rodriguez seeks a writ of habeas corpus to challenge his 2002 conviction in New York State Supreme Court, Bronx County, on single counts of Manslaughter in the First Degree, Assault in the First Degree, Gang Assault in the First Degree, and Criminal Possession of a Weapon in the Fourth Degree. The trial court sentenced Rodriguez to three concurrent terms of twenty years on the manslaughter and assault counts, as well as a concurrent term of one year on the weapon-possession count.

Rodriguez challenges his conviction and sentence on two grounds. He first complains that the evidence was legally insufficient to support his manslaughter conviction, arguing that the State failed to establish beyond a reasonable doubt that he had the requisite intent, and that the Appellate Division's decision affirming his convictions was thus an unreasonable application of

clearly established federal law. (Pet. ¶ 13; Petr.'s Reply 8-14). He next asserts that his twenty-year sentence was "excessively harsh" and should be reduced. (Pet. ¶ 13).

Respondent maintains that the petition must be dismissed. He asserts that the legal-insufficiency claim does not warrant habeas relief since (1) the Appellate Division's decision denying it was neither contrary to, nor an unreasonable application of, clearly established federal law, and (2) the claim is procedurally barred insofar as it concerns petitioner's assault convictions. (Respt.'s Mem. of Law 3 [hereinafter Respt.'s Mem.]). Respondent further argues that petitioner's excessive-sentence claim fails because he did not exhaust his state-court remedies, and because it does not rise to the level of a constitutional violation. (Respt.'s Mem. 18-19). For the reasons that follow, we recommend that the writ be denied and the petition dismissed with prejudice.

## PRIOR PROCEEDINGS

The charges against petitioner stemmed from his involvement in a group attack against Terrence Ramos on the night of February 20, 2001. The injuries Mr. Ramos sustained as a result of the beating ultimately led to his death.

2

By Indictment Number 1308/01, a Bronx County grand jury charged petitioner with Criminal Possession of a Weapon in the Fourth Degree, Assault in the First Degree, Gang Assault in the First Degree, Manslaughter in the First Degree, and two counts of Murder in the Second Degree. (Aff. of Ass't Dist. Att'y Eldar Mayouhas, sworn to May 2, 2005, Ex. 6).[1] The bench trial of petitioner and his six co-defendants commenced on September 23, 2002, before Supreme Court Justice John S. Moore. (Trial Tr. 1 [hereinafter Tr.]).

A. <u>The Trial</u>

At trial, the State presented the testimony of Roberto Acevedo, Armando Quevedo, and Malika Bush, all of them eyewitnesses to the attack; William Carson, a police officer assigned to the Bronx on the night of Mr. Ramos's attack; Michael Cantatore, a police sergeant on duty in Manhattan that night; Steven Rodriguez, Miguel Rodriguez, and Robert Colten, police detectives who assisted in the investigation of Mr. Ramos's death; and Dr. James Gill, the Deputy Medical Examiner of Bronx County. In addition, the State

---

[1] The indictment charged four co-defendants -- July Barrett, Richard Rodriguez, Lewis Gomez, and Luis Torres -- with the same crimes. (Mayouhas Aff. Ex. 6). Co-defendants Michael Rodriguez and Terrell Pinkney were charged in a separate indictment, Indictment Number 2407/2001, and all indictments were consolidated at pre-trial hearings. (Mayouhas Aff. Ex. 3 at 3 & n.1 [hereinafter Respt.'s App. Br.]).

3

introduced petitioner's videotaped statement, made on the evening of February 21, 2001 to an Assistant District Attorney and a police detective, and the videotaped statement of co-defendant Lewis Gomez, made the same evening. (See Respt.'s Mem. 5 n.2; Respt.'s Ex. 4; Respt.'s Ex. 5).[2] The defense presented no evidence. (Tr. 487-88). We briefly summarize the facts that the trial court was free to find in support of the verdict.

On February 20, 2001, petitioner approached some of his friends, told them he had been jumped by someone, and recruited them to go with him to find and "do this kid." (Respt.'s Ex. 4 CML1-2, CML8, CML11, CML21). The person they were looking for was Terrence Ramos, who, by petitioner's account, had previously been his close friend. (Respt.'s Ex. 5 CML8, CML13, CML15-16, CML27). Petitioner rounded up his friends, who did not know Mr. Ramos, and armed himself with a boxcutter, because he was frightened by Mr. Ramos, who was "known for carrying a gun and a knife." (Id. at CML19, CML23; see id. at CML24-26). As petitioner further explained, he wanted to "go over there and confront him in that manner" (id. at CML23) and "get this matter done" because he did not want to "be running from place to place just because I'm scared of a guy I'm thinking he gonna hit me or kill me." (Id. at CML25).

_____

[2] We cite the exhibits annexed to the Mayouhas affidavit as "Respt.'s Ex. __."

4

A group of seven then got into a van to look for Mr. Ramos. (See Resp't's Ex. 4 CML21; Resp't's Ex. 5 CML8). They drove around the vicinity of Morris Avenue and East 173rd Street in the Bronx. Spotting their target at the corner of Eastburn Avenue and East 173rd Street, petitioner pointed him out to his companions in the van. (See Resp't's Ex. 5 CML8; Resp't's Ex. 4 CML10-11; see also Tr. 41-42, 294, 297).

The seven left the van, approached Mr. Ramos, and surrounded him. (Tr. 413). One eyewitness, Mr. Quevedo, described first seeing two people at the corner of East 173rd and Eastburn, hiding near a building and peering around it, as if they were waiting for someone. (Tr. 406-09). Mr. Quevedo saw these people look down the street towards a white van parked nearby, and then leave the corner to approach Mr. Ramos. (Tr. 409-12). He reported seeing one person grab Mr. Ramos as the other signaled the van, which then drove down the block. (Tr. 412). According to Mr. Quevedo, the van pulled up to the corner, and several men came out of it and started beating Mr. Ramos. (Tr. 413; see also Resp't's Ex. 4 CML8, CML17-19; Resp't's Ex. 5 CML8, CML11, CML29; Tr. 43, 61-63).

This account was corroborated by the testimony of Ms. Bush, a friend of Mr. Ramos, who had been with Mr. Ramos when he was

approached and grabbed by "some guy" who "came out of nowhere."
(Tr. 297; see Tr. 294-99). Ms. Bush described "all of a sudden"
seeing "another one," and then seeing "more people coming, more
guys." (Tr. 299). No one else had been with Mr. Ramos and Ms. Bush,
and Ms. Bush ran from the scene, fearing for her own safety. (Tr.
299-301; see also Respt.'s Ex. 4 CML13).

       According to one witness, Mr. Acevedo, petitioner and the
other men began attacking Mr. Ramos, "beating on him and kicking
and swinging their arms." (Tr. 61). Petitioner's co-defendant Gomez
recounted "punching and stuff, and kicking" Mr. Ramos, and "hitting
him, hitting him" after the victim had fallen to the ground.
(Respt.'s Ex. 4 CML14). Petitioner's version of the events was
largely the same. (Respt.'s Ex. 5 CML11, CML29). The group remained
"all over" Mr. Ramos (Tr. 61), "hitting him and on top of him," as
Mr. Ramos unsuccessfully tried to escape. (Tr. 62; see also Tr.
414). Several members of the group were armed with knives, which
they also used to attack the victim (see Respt.'s Ex. 4 CML9,
CML12-13, CML17; Respt.'s Ex. 5 CML 11, CML19-20; Tr. 172, 217-18,
226-27, 315-16, 323-24, 357-58), and one of the attackers was seen
raising a closed fist overhead and driving it down twice in a
thrusting motion towards the victim. (Tr. 415). At some point
during the attack, Gomez stabbed Mr. Ramos with a large kitchen
knife. (Respt.'s Ex. 4 CML9, CML12, CML14-15). Petitioner also

personally described punching and kicking Mr. Ramos, and slicing his face with a boxcutter. (Respt.'s Ex. 5 CML9, CML11, CML19-20, CML29). Petitioner further recounted kicking Mr. Ramos in the face while he was on the ground, just before everyone rushed back into the van to flee from the scene. (Id. at CML9, CML29).

Once everyone was in the van, it sped away quickly, nearly hitting Mr. Acevedo in the process. (See Respt.'s Ex. 4 CML15-16; Tr. 49, 433-37, 440-41). As petitioner and his cohorts fled, Mr. Acevedo and Mr. Quevedo followed in Mr. Acevedo's minivan, calling 911 as they pursued the van into Manhattan. (Tr. 50-51, 437-39). Along the way, they spotted three police officers in an unmarked police car and told them about what they had witnessed in the Bronx. (Tr. 51-52, 310, 442). The officers pursued the white van, eventually pulling it over. (Tr. 308, 310A-12, 442-43).

After the police officers stopped the van, they removed seven individuals, including petitioner, who was not wearing shoes at the time. (Tr. 312-15, 319, 443). The officers then searched the van, discovering a large kitchen knife, a smaller kitchen knife, a folding locked knife, and a boxcutter, as well as a pair of white sneakers with blood on them. (Tr. 315-16, 323-24).[3] The larger

---

[3] All of these items were admitted into evidence at trial. (See Tr. 179-88). The larger kitchen knife was described as

7

kitchen knife was later found to have Mr. Ramos's blood on it. (Tr. 357-58).

In the meantime, Officer Carson had responded to the site of the attack, finding Mr. Ramos lying face down on the ground in a pool of blood, not breathing and without a pulse. (Tr. 151-54, 159). The officer also found blood on a car parked near the intersection of Eastburn Avenue and East 173rd Street, and other evidence indicating that "some kind of fight -- or some kind of incident" had occurred. (Tr. 157). No weapons were found in the area, and it was undisputed that Mr. Ramos was unarmed. (See Tr. 155, 159; Respt.'s Ex. 4 CML15).

The autopsy revealed that Mr. Ramos had suffered numerous injuries prior to his death. (Tr. 215, 217). Among them were several cuts and stab wounds, including two cuts on his left cheek in the shape of a cross (one of which was four inches long), a stab wound in his left leg, another in his left buttock, and a stab wound in his chest, which penetrated his heart. (Tr. 217-18, 251). The medical examiner testifying at trial observed that the chest wound in particular required "a good amount of force" (Tr. 256) and ultimately caused a large amount of blood to pool around Mr. Ramos's heart and chest cavity. (Tr. 218). The chest wound was

thirteen-and-a-half inches long. (See, e.g., Tr. 357).

consistent with having been caused by the larger of the two kitchen knives, while the other stab wounds were consistent with having been caused by a smaller knife. (Tr. 226-27, 264). The chest and heart wounds were ultimately determined to be the medical cause of death. (Tr. 220). Other injuries included lacerations, contusions, and abrasions, which were consistent with Mr. Ramos having been punched and kicked, and multiple blunt injuries to his face, head, and body. (Tr. 217-20). Finally, the autopsy revealed no evidence of alcohol or drugs in Mr. Ramos's blood. (Tr. 229).

B. The Verdict and Sentencing

Following the presentation of evidence, petitioner's counsel, Louis Alperin, Esq., moved to dismiss both murder charges as well as the first-degree manslaughter charge, arguing insufficiency of the evidence. (Tr. 384-91, 490).[4] In so arguing, Mr. Alperin explicitly admitted that the evidence was sufficient with respect to both assault charges. (Tr. 391, 490). The judge denied the motion. (Tr. 492).

During summations, Mr. Alperin sought to cast doubt on

---

[4] Petitioner's counsel began arguing his motion prior to the testimony of the final witness, who did not originally appear when scheduled, and completed his argument after that witness had given testimony the following day, which concluded the presentation of evidence. (See Tr. 383-84, 488-90).

petitioner's responsibility for Mr. Ramos's death (Tr. 517-32), but he again conceded his client's guilt on the assault counts, going so far as to say "my client is guilty of Gang Assault in the First Degree" (Tr. 518), and that gang assault, criminal possession of a weapon, and first-degree assault were "three crimes I cannot dispute." (Tr. 519-20). The trial judge found petitioner guilty of first-degree manslaughter, both assault charges, and the weapon-possession charge. (See Tr. 559-60). Mr. Alperin made a post-verdict motion to set aside the manslaughter conviction (Sentencing Tr. 3-8 [hereinafter S. Tr.]), but again conceded petitioner's guilt on the assault counts, stating, "I do feel and cannot argue with the gang assault or the assault." (S. Tr. 7). The court again denied the motion. (S. Tr. 8).

On December 9, 2002, Justice Moore sentenced petitioner to three concurrent terms of twenty years imprisonment on the manslaughter and assault counts, and one concurrent term of one year on the weapon-possession count. (S. Tr. 19). Before delivering the sentence, he noted that petitioner "was the prime mover" in the incident "because it was his beef with the deceased that led to the confrontation, the attack, and the ultimate death of the deceased." (S. Tr. 16). The trial judge also stated that the "acts in this case were horrific and for that [petitioner] has to accept responsibility." (S. Tr. 16).

10

C. State Court Appeals


Petitioner appealed his conviction to the First Department. (See Pet. ¶ 10; Br. for Defendant-Appellant, attached to Pet. [hereinafter Petr.'s App. Br.].). On appeal he argued that the evidence was insufficient to support his assault and manslaughter convictions, because it was not proven beyond a reasonable doubt that he had shared the intent of his co-defendant Gomez when Gomez stabbed Mr. Ramos. (See Petr.'s App. Br. 15-16). He also argued that his sentence was excessive "under the circumstances," since he was a "young man without a criminal record,[5] who was employed, who lived with his mother, and who, early on, grasped and regretted the terrible mistake he had made." (Petr.'s App. Br. 23).


The Appellate Division unanimously affirmed petitioner's conviction, holding that the "verdict was based on legally sufficient evidence and was not against the weight of the evidence" and further stating that it perceived "no basis for reducing the sentence." People v. Rodriguez, 7 A.D.3d 448, 448, 776 N.Y.S.2d 792, 793 (1st Dep't 2004). The court explained that the "manslaughter conviction was supported by evidence warranting the conclusion that defendant shared a community of purpose with a

---

[5] The State disputed the contention that petitioner had had no criminal record prior to his trial and conviction. (See Respt.'s App. Br. 26).

11

companion who stabbed the victim in the heart." Id. As to the assault convictions, the Appellate Division noted that petitioner had conceded his guilt of the assault counts at trial "and his present challenges to those convictions are unpreserved and unavailing." Id.

On June 22, 2004, petitioner filed an application for leave to appeal to the New York Court of Appeals. (See Respt.'s Ex. 3). The Court denied the request on July 22, 2004. People v. Rodriguez, 3 N.Y.3d 662, 782 N.Y.S.2d 704 (2004). It appears that petitioner nonetheless filed a notice of appeal, for on September 21, 2004, the Court of Appeals dismissed his appeal sua sponte "upon the ground that no civil appeal lies as of right from the order of the Appellate Division entered in this criminal proceeding." People v. Rodriguez, 3 N.Y.3d 699, 785 N.Y.S.2d 19 (2004). On December 9, 2004, petitioner filed his habeas petition.


ANALYSIS


I.   Evidentiary-Insufficiency Claim


Petitioner asserts that the evidence offered at trial was legally insufficient to prove him guilty of first-degree manslaughter or either of the first-degree assault counts because

12

it did not establish his intent to cause serious physical injury. Specifically, he argues that the evidence did not establish beyond a reasonable doubt that he shared his co-defendant's intent to stab Mr. Ramos in the chest. (Pet. ¶ 13; Petr.'s App. Br. 15-22; Petr.'s Reply 8-14).

Respondent contends that petitioner's attack on his assault convictions is procedurally barred and that his evidentiary-insufficiency claim is in all respects meritless. We agree.

A.   Procedural Default

It is well established that there can be no federal habeas relief on a claim that "a state court declined to address . . . because the prisoner had failed to meet a state procedural requirement." Coleman v. Thompson, 501 U.S. 722, 730 (1991); accord, e.g., Rodriguez v. Schriver, 392 F.3d 505, 509 (2d Cir. 2004). In such a case, federal habeas review is foreclosed because the state court's decision rests on an independent and adequate state ground and there is no question of federal law to review. See, e.g., Coleman, 501 U.S. at 729. This principle "applies whether the state law ground is substantive or procedural." Id.

Under New York law, the "basic rules of preservation" require

13

a criminal defendant to bring "any matter which a party wishes the appellate court to decide . . . to the attention of the trial court at a time and in a way that gave [the trial court] the opportunity to remedy the problem and thereby avert reversible error." People v. Luperon, 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 738-39 (1995). Thus, it is "undisputed" that a petitioner's failure to protest an adverse instruction or ruling in a criminal proceeding constitutes a procedural default. Fernandez v. Leonardo, 931 F.2d 214, 216 (2d Cir. 1991); see generally N.Y. Crim. Proc. Law § 470.05 (establishing the rule that New York appellate courts can only review questions of law that have been preserved via an objection or protest made at the time of the criminal trial or proceeding); People v. Gray, 86 N.Y.2d 10, 19-22, 629 N.Y.S.2d 173, 175-77 (1995). Moreover, to preserve an insufficient-evidence claim, a criminal defendant must direct his argument to the specific deficiency alleged; general motions to dismiss for insufficiency of the evidence are not adequate to preserve the claim for appellate review. See, e.g., Green v. Travis, 414 F.3d 288, 294-95 (2d Cir. 2005); Gray, 86 N.Y.2d at 19, 629 N.Y.S.2d at 175; People v. Rodriguez, 262 A.D.2d 428, 428, 693 N.Y.S.2d 54, 55 (2d Dep't 1999).

Here, petitioner's trial counsel failed to preserve the insufficient-evidence claim as to the assault convictions. During

14

both of the motions he made at trial -- first to dismiss the charges and then to set aside the conviction -- he not only failed to argue any specific deficiency as to the evidence supporting the assault counts, but he also conceded that the evidence was sufficient to find petitioner guilty of the assaults. Petitioner's concession of the sufficiency of the evidence on the assault charges thus waived any such argument under New York law.

As a result, the Appellate Division concluded that petitioner's challenges to his assault convictions were "unpreserved." Rodriguez, 7 A.D.3d at 448, 776 N.Y.S.2d at 793. This statement suffices to show that the court relied on state waiver law for the purposes of federal habeas review. See, e.g., Harris v. Reed, 489 U.S. 255, 265 n.12 (1989); Cancela v. Bennett, 2004 WL 103009, at *5 (S.D.N.Y. Jan. 23, 2004). Moreover, this is true even though the court held in the alternative that there was no merit to petitioner's insufficient-evidence claim as to the assault convictions. See, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 n.4 (2d Cir. 2000); Glenn v. Bartlett, 98 F.3d 721, 724-25 & n.3 (2d Cir. 1996).[6]

---

[6] The Second Circuit's recent holding in Jimenez v. Walker, 458 F.3d 130 (2d Cir. 2006), does not alter this conclusion. Jimenez provides guidance when the state court recites that a defendant's claim is "either unpreserved for appellate review or without merit," 458 F.3d at 135 (citation omitted), thus making it "difficult to decide whether a state court rested its judgment on the merits of the federal claim or on an independent

In sum, petitioner's evidentiary-insufficiency claim as to the assault counts is procedurally defaulted, and absent a showing of cause and prejudice or actual innocence, which petitioner has not made, petitioner cannot now raise his claim. See, e.g., Bousley v. United States, 523 U.S. 614, 622 (1998) (citations omitted). As we discuss below, petitioner's challenge would in any event fail because there was more than sufficient evidence to support a guilty verdict on both assault counts.


B.   The Merits of the Evidentiary-Insufficiency Claim


1.   The AEDPA Inquiry


Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), the scope of the federal court's habeas review turns on whether the state court has adjudicated the petitioner's claim on the merits, that is, whether the decision of the highest state court to consider the claim "is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). Where the state court has addressed a

procedural rule." Id. at 136. The Appellate Division's decision here clearly rests on a procedural bar, see, e.g., Fama, 235 F.3d at 811 n.4, and thus we do not need to apply the analytic approach delineated in Jimenez.

habeas petitioner's claims on the merits, the petitioner must meet a stringent standard before a federal court can issue the writ. Specifically, habeas relief may be granted only when the state court's decision

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See, e.g., Williams v. Taylor, 529 U.S. 362, 375-90 (2000); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005).

Here, the Appellate Division adjudicated the merits of petitioner's insufficient-evidence claim as to the manslaughter conviction. The state court addressed the substance of the claim, concluding that the "verdict was based on legally sufficient evidence," and made the specific finding that the evidence established that petitioner had the requisite intent for manslaughter since it "warrant[ed] the conclusion that [petitioner] shared a community of purpose with a companion who stabbed the victim in the heart." Rodriguez, 7 A.D.3d at 448, 776 N.Y.S.2d at 793. As for the assault charges, if we disregarded the Appellate Division's reference to the unpreserved nature of petitioner's evidentiary-insufficiency argument, we would also be left with that

17

court's merits-based conclusion that the argument is "unavailing." Id. We thus now examine whether the appellate court's rulings were contrary to or an unreasonable application of Supreme Court law or based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d); see also, e.g., Howard, 406 F.3d at 122.

2.   Standard of Review

In addressing petitioner's challenge to the sufficiency of the evidence, a federal habeas court's review is "sharply limited." Wright v. West, 505 U.S. 277, 296 (1992). As the Supreme Court has repeatedly emphasized, "[f]ederal courts are not forums in which to relitigate state trials," Herrera v. Collins, 506 U.S. 390, 401 (1993) (quoting Barefoot v. Estelle, 463 U.S. 880, 887 (1983)), and the habeas court consequently "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." Herrera, 506 U.S. at 402.

Petitioner thus "bears a very heavy burden" in demonstrating that his petition should be granted on the grounds of insufficient evidence. Fama, 235 F.3d at 811. Habeas relief will be denied and a state criminal conviction upheld if, "after viewing the evidence

in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); accord, e.g., United States v. Nelson, 277 F.3d 164, 195 (2d Cir. 2002). Under this rigorous standard, a federal habeas court faced with an evidentiary record "that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Wright, 505 U.S. at 296-97 (quoting Jackson, 443 U.S. at 326). In addition, "these principles apply whether the evidence being received is direct or circumstantial," Nelson, 277 F.3d at 195 (quoting United States v. Gore, 154 F.3d 34, 40 (2d Cir. 1998)), and it is well established that guilt beyond a reasonable doubt may be determined based entirely on circumstantial evidence. See, e.g., Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).

3. The Merits

Under these criteria, petitioner has plainly not met his burden. There was ample trial evidence to support the manslaughter

and both assault convictions,[7] and the Appellate Court's determination was thus neither an unreasonable application of or contrary to Supreme Court law, nor an unreasonable determination of the facts based on the evidence presented. We begin by briefly reviewing the elements of those crimes as defined by state law. See, e.g., Fiore v. White, 531 U.S. 225, 228-29 (1999); Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999).

Under New York law, a person is guilty of gang assault in the first degree when, "with intent to cause serious physical injury to another person and when aided by two or more other persons actually present, he causes serious physical injury to such person." N.Y. Penal Law § 120.07. A person is guilty of assault in the first degree when:

> (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . . by means of a deadly weapon or dangerous instrument; or
>
> (2) With intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person . . . .

N.Y. Penal Law § 120.10. Finally, a person is guilty of manslaughter in the first degree when, "[w]ith intent to cause

---

[7] Although petitioner's claim as to the assault convictions is procedurally defaulted, we briefly discuss it to demonstrate that it is also patently without merit.

serious physical injury to another person, he causes the death of such person." N.Y. Penal Law § 125.20(1).

Each of these crimes requires proof of an intent to cause "serious physical injury." Since it is "seldom possible to present testimonial or direct evidence of an accused's state of mind," triers of fact must "consider[] the laws that generally govern human conduct" and "use their experiences with people and events to weigh probabilities." Mallette v. Scully, 752 F.2d 26, 32 (2d Cir. 1984). Thus, intent may be inferred, Rivera v. Coombe, 683 F.2d 697, 701-02 (2d Cir. 1982), and "must usually be proven by circumstantial evidence." United States v. Kwong, 14 F.3d 189, 194 (2d Cir. 1994). We also reiterate that the intent the State needed to establish beyond a reasonable doubt was not, as petitioner contends, that petitioner had "Gomez's intent to stab Ramos in the chest" (Petr.'s App. Br. 19), but rather that petitioner intended to cause serious physical injury to Mr. Ramos. See N.Y. Penal Law §§ 120.07, 120.10(1), 125.20(1). As we have discussed, there was ample evidence permitting a rational fact-finder to conclude that petitioner had the requisite intent.

The assault convictions are clearly unassailable, as petitioner's own trial counsel recognized, because the evidence unquestionably supported the finding that petitioner intended to,

21

and did indeed cause, serious physical injury to Mr. Ramos, and that he was "aided by two or more persons" who were present at the time of the attack. <u>See</u> N.Y. Penal Law §§ 120.07, 120.10. The evidence showed that petitioner, upset over a previous altercation with Mr. Ramos, rounded up six other young men and set out with them to find Mr. Ramos. Once they found him, the group engaged in a brutal attack, inflicting multiple stab wounds, lacerations, contusions, and abrasions to Mr. Ramos's head, face, and body; these injuries ultimately resulted in Mr. Ramos's death. The evidence also established that petitioner was actively involved in the attack: he kicked, punched, and cut Mr. Ramos, while his companions did the same. Indeed, petitioner delivered the final blow to the victim, when, immediately prior to rushing everyone back into the van, he kicked Mr. Ramos in the face while the victim lay on the ground. In addition, petitioner admitted having sliced Mr. Ramos's face with a box cutter, and among Mr. Ramos's wounds were two cuts in the shape of an "x" on his left cheek, including one that was four inches long. Along with the box cutter, three other knives were found in the group's possession -- a thirteen-and-a-half inch kitchen knife, a smaller kitchen knife, and a folding knife -- and the evidence showed that at least two of these knives had been used during the group's attack. The evidence further showed that after finishing their beating, the group fled, leaving Mr. Ramos lying bleeding and severely injured on the ground

on a winter night. During the entire incident, Mr. Ramos had been unarmed and unassisted. In short, there was more than sufficient evidence for a trier of fact to rationally determine that petitioner had the requisite intent for gang assault and assault in the first degree.[8] See Herrera, 506 U.S. at 402.

We also conclude that the same evidence amply supports petitioner's conviction for manslaughter in the first degree. Petitioner's arguments to the contrary are that (1) he did not have the requisite intent for manslaughter because he did not share the intent of his co-defendant Gomez, who stabbed Mr. Ramos in the chest, and (2) the serious physical injury that petitioner caused Mr. Ramos through the facial cuts are distinguishable from the serious physical injury resulting from the chest stabbing. (Petr.'s App. Br. 16-22; Petr.'s Reply 11-13). We agree with the State, the trial court, and the Appellate Division that neither argument is availing.

Petitioner relies heavily on a New York Appellate Division

---

[8] We further note that petitioner's trial lawyer and petitioner himself conceded petitioner's guilt on the assault counts. (See Respt.'s Ex. 5 CML28-29; Tr. 518-21; S. Tr. 7). Even petitioner's appellate lawyer, in trying to distinguish between the various serious physical injuries inflicted on Mr. Ramos, implicitly conceded that petitioner had intentionally caused serious physical injury to Mr. Ramos through the facial cuts. (See Petr.'s App. Br. 21).

case, <u>People v. Rivera</u>, 176 A.D.2d 510, 575 N.Y.S.2d 7 (1st Dep't 1991), in arguing that there was "no design to stab Ramos or a community of purpose between [petitioner] and Gomez" and that he therefore did not have the requisite intent. (<u>See</u> Petr.'s App. Br. 18). He compares his case with <u>Rivera</u>, in which a spontaneous street fight between two groups of young men (who appeared to be strangers to one another) led to the death of the victim. In that case, the court held that there was "an insufficient showing of any design by defendant . . . to cause the deceased serious physical injury or a showing of a community of purpose between the stabber . . . and defendant." <u>Rivera</u>, 176 A.D.2d at 511, 575 N.Y.S.2d at 7.

Petitioner's case, however, is quite different from Rivera's: as opposed to an unplanned street scuffle, the assault that led to Mr. Ramos's death was provoked and led by petitioner. Viewing the evidence in the light most favorable to the prosecution and drawing all inferences in its favor, a trier of fact could have rationally concluded that petitioner recruited the six other young men with the sole purpose of hunting down Mr. Ramos, that petitioner knew that some members of his group were armed, as he himself was,[9] and that petitioner intended for those weapons to be used against Mr. Ramos. A trier of fact could also have concluded that petitioner

---

[9] The State suggests that it is difficult to conceal a thirteen-inch kitchen knife. (<u>See, e.g.</u>, Respt.'s Mem. 12; Respt.'s App. Br. 23). We agree.

knew that an attack by seven people against one, even without the use of weapons, would likely lead to serious physical injury and could result in death. A trier of fact could further have concluded that petitioner's intent to cause serious physical injury to Mr. Ramos was evinced when petitioner, after kicking Mr. Ramos one last time in the face, fled the scene and did not seek medical attention for Mr. Ramos, leaving the victim wounded on the ground on a winter night after a severe beating. Finally, a trier of fact could have reasonably concluded that Mr. Ramos died as a result of the injuries he suffered in the beating instigated by petitioner. In sum, there was sufficient evidence for the trial court to determine that petitioner intended to cause serious physical injury to Mr. Ramos, that the attack he initiated and led caused Mr. Ramos's death, and that there was consequently a constitutionally sufficient basis for petitioner's manslaughter conviction. See, e.g., Hill v. Keane, 28 F. Supp. 2d 850, 851-52 (S.D.N.Y. 1998); Carromero v. Strack, 1998 WL 849321, at *4-7 (S.D.N.Y. Nov. 19, 1998); Steinberg v. Comm'r of Corr. Servs., 1998 WL 259948, at *3 (S.D.N.Y. May 21, 1998).

In focusing on the evidence about which particular wound was ultimately determined to be the medical cause of death and the fact that it was Gomez who stabbed Mr. Ramos in the chest, petitioner ignores the leading role that he himself played in the attack and

25

misstates the nature of what the State was required to prove. To establish that petitioner possessed the intent required for a manslaughter conviction, the prosecution did not need to show that Gomez intended to stab Mr. Ramos and that petitioner shared that intent, or that petitioner intended the particular injury that was found to be the medical cause of death; rather, the prosecution needed to prove only that petitioner intended to cause serious physical injury to Mr. Ramos. See, e.g., People v. Fernandez, 215 A.D.2d 234, 235, 626 N.Y.S.2d 190, 191 (1st Dep't 1995) (observing that "the specific intent in first degree manslaughter is to cause serious physical injury with the strict liability or unintended result being the death of the victim"). Indeed, in a case factually very similar to the present case, a petitioner was found to have the requisite intent for manslaughter even though it was his companion who shot and killed the victim, and even though the petitioner claimed to have no knowledge that his companion had a gun or was going to shoot. Carromero, 1998 WL 849321, at *1-2, *7-8. The petitioner in that case had also asserted that he could not have shared his companion's intent, but the court rejected that claim, noting that there "was no evidence of any other motive for Otero to have shot Garcia," and thus that the trier of fact "could reasonably have concluded that Carromero [the petitioner] intended, through Otero, to seriously harm Garcia." Id. at *7.

26

As we have repeatedly stated, there was more than sufficient evidence for a rational fact-finder to conclude that petitioner intended to cause serious physical injury to Mr. Ramos, whether based on petitioner's own involvement in the attack, see Hill, 28 F. Supp. 2d at 852, or on his solicitation, assistance, and encouragement of the six others, including Gomez, see Carromero, 1998 WL 849321, at *7, or his abandonment of Mr. Ramos after the beating. See Steinberg, 1998 WL 259948, at *3.[10]  Further, and as the trial court noted (see S. Tr. 9; see generally Respt.'s Ex. 6), there was also more than sufficient evidence to establish that petitioner, acting in concert with his co-defendants, caused the death of Mr. Ramos. See, e.g., Carromero, 1998 WL 849321, at *2-3, *8; People v. Lieberman, 3 N.Y.2d 649, 651-54, 171 N.Y.S.2d 73, 74-77 (1958); see generally N.Y. Penal Law § 20.00; DeJesus v. Miller, 323 F. Supp. 2d 547, 556 (S.D.N.Y. 2004). The Appellate Division's determination that petitioner "shared a community of purpose with a companion who stabbed the victim in the heart," Rodriguez, 7 A.D.3d at 448, 776 N.Y.S.2d at 793, was thus well-supported by the evidence, and obviously not contrary to or an unreasonable

---

[10] We note that petitioner was acquitted of intentional murder and murder in the second degree (see Tr. 559), thus indicating that the trial court considered the intent issue and found that the State had not proved beyond a reasonable doubt that petitioner intended to cause the death of Mr. Ramos, but rather had shown that he intended to cause serious physical injury. Compare N.Y. Penal Law §§ 125.25(1) and (2) with N.Y. Penal Law § 120.10.

application of clearly established federal law or an unreasonable determination of the facts. 28 U.S.C. § 2254(d); see, e.g., Malette, 752 F.2d at 33; Carromero, 1998 WL 849321, at *2-3, *7-8; People v. Rivera, 199 A.D.2d 92, 92-93, 605 N.Y.S.2d 53, 54 (1st Dep't 1993).

In sum, we find no reason to grant petitioner habeas relief on his insufficient-evidence claim.

## II. Excessive-Sentence Claim

Petitioner also argues that his sentence is "excessively harsh and should be reduced." (Pet. ¶ 13). The State contends that petitioner's claim is unexhausted since he did not present it as a constitutional claim and did not ask the Court of Appeals to review it. (See Respt.'s Mem. 18). The State further asserts that the Court should deem this claim exhausted yet procedurally forfeited, arguing that there are no remaining procedures by which petitioner could return to state court and present his unexhausted claim. (Respt.'s Mem. 18). For the reasons that follow, we find that petitioner's excessive-sentence claim is so plainly meritless that we need not address the exhaustion issue.

Under the habeas statute, while a federal court may not grant

28

habeas relief to a petitioner who failed to exhaust a claim in the state courts, it retains the discretion to deny the claim on the merits. <u>See</u> 28 U.S.C. § 2254(b); <u>Duncan v. Walker</u>, 533 U.S. 167, 191 (2001) (observing that "the prisoner who chooses to go into federal court with unexhausted claims runs the risk that the district court will simply deny those claims on the merits, as it is permitted to do"); <u>Jones v. Keane</u>, 329 F.3d 290, 294 n.6 (2d Cir. 2003) ("As modified by AEDPA, the federal habeas statute permits federal courts to <i>deny</i> unexhausted claims on the merits."). Unexhausted claims may be denied on the merits when such claims are not viable, for example, because they are "patently frivolous" or because they are not cognizable in a federal habeas corpus proceeding. <u>See, e.g.</u>, <u>King</u>, 442 F. Supp. 2d at 182; <u>Hsu v. Cunningham</u>, 2006 WL 938729, at *1, *4 (S.D.N.Y. Apr. 11, 2006); <u>Naranjo</u>, 2003 WL 1900867, at *8-9, *13. Because we find, for the reasons discussed below, that petitioner's excessive-sentence claim is clearly without merit, we conclude that it cannot justify federal habeas corpus relief.

    It is well-established that there is no violation of the Eighth Amendment "where, as here, the sentence is within the range prescribed by state law." <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992). Constitutional review of state sentencing decisions is generally limited to whether the sentencing court relied upon

constitutionally impermissible considerations, see, e.g., Alabama
v. Smith, 490 U.S. 794, 798-800 (1989); United States v.
Singletary, 458 F.3d 72, 75-76 (2d Cir. 2006), whether it relied
upon materially incorrect information, see, e.g., Townsend v.
Burke, 334 U.S. 736, 741 (1948); King v. Hoke, 825 F.2d 720, 724-25
(1987), and whether the sentence violated the Ex Post Facto or
Double Jeopardy clause. See, e.g., Jones v. Thomas, 491 U.S. 376,
380-87 (1989); Miller v. Florida, 482 U.S. 423, 429-34 (1987);
United States v. Meeks, 25 F.3d 1117, 1120-24 (2d Cir. 1994);
Stewart v. Scully, 925 F.2d 58, 62-65 (2d Cir. 1991). The habeas
court may also review whether a state sentence was "grossly
disproportionate" to the crime committed, a finding "applicable
only in the 'exceedingly rare' and 'extreme' case." Lockyer v.
Andrade, 538 U.S. 63, 73 (2003); see also, e.g., Ewing v.
California, 538 U.S. 11, 21 (2003); United States v. Snype, 441
F.3d 119, 152 (2d Cir. 2006).

Petitioner has made no showing that his sentence violated the
Eighth Amendment. It did not exceed the statutory maximum nor was
it "constitutionally disproportionate" in light of the facts of the
case.

Petitioner was convicted of first-degree manslaughter, first-
degree assault, and first-degree gang assault, all Class B violent

felonies under New York law. <u>See</u> N.Y. Penal Law § 70.02(1)(a). As a result, he was required to be sentenced to a term of imprisonment of between five and twenty-five years. <u>See</u> N.Y. Penal Law § 70.02(3)(a). His concurrent sentences of twenty years were thus within the range prescribed by law and consequently do not present a "federal constitutional issue." <u>White</u>, 969 F.2d at 1383.

Moreover, it is clear that petitioner could not establish that his is one of the 'exceedingly rare' and 'extreme' cases that present an Eighth Amendment violation under the gross-disproportionality principle.[11] Under this principle, "[l]engthy prison sentences, even those that exceed any conceivable life expectancy of a convicted defendant," are almost always found constitutional. <u>United States v. Yousef</u>, 327 F.3d 56, 163 (2d Cir. 2003). It is in fact only the "extraordinary case" that presents an Eighth Amendment violation. <u>Lockyer</u>, 538 U.S. at 77.

Petitioner concedes that his twenty-year sentence was not an abuse of discretion, and far from suggesting that his sentence was disproportionate -- let alone grossly disproportionate -- he argues only that "a sentence closer to 10 or 15 years' imprisonment would

---

[11] Although petitioner makes no explicitly constitutional arguments in challenging his sentence, we construe his claim liberally to allege cruel and unusual punishment in violation of the Eighth Amendment, and thus apply the gross-disproportionality principle in reviewing it. <u>Lockyer</u>, 538 U.S. at 72.

have been severe enough punishment." (Petr.'s App. Br. 24). Given the brutal nature of the crimes for which petitioner was convicted, the fact that he was the "prime mover" in an incident that culminated in the death of another (S. Tr. 16), and the lack of any mitigating evidence (see S. Tr. 12-15), petitioner's twenty-year imprisonment can hardly be deemed constitutionally excessive. See, e.g., Yousef, 327 F.3d at 163 (discussing cases in which prison sentences of one hundred years or more for non-violent crimes were found constitutional). Indeed, the United States Supreme Court has upheld far harsher sentences, such as a first-time offender's sentence of life imprisonment without the possibility of parole for cocaine possession. See Harmelin v. Michigan, 501 U.S. 957, 996 (1991). It thus follows that the Appellate Division's endorsement of the sentencing court's decision was constitutionally unassailable and in no respect contrary to, or an unreasonable application of, clearly established federal law. See Ewing, 538 U.S. at 20-23 (discussing cases); Lockyer, 538 U.S. at 73-77 (affirming the gross-disproportionality principle as "clearly established" federal law).

In short, petitioner's complaints about his sentence cannot warrant habeas relief.

CONCLUSION

CONCLUSION

For the reasons stated, we recommend that the writ be denied on the merits and the petition dismissed with prejudice.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Sidney H. Stein, Room 1010, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

DATED: New York, New York
       January 3, 2007

RESPECTFULLY SUBMITTED,

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

33

Copies of the foregoing Report and Recommendation have been mailed
this date to:

Mr. Javier Rodriguez
# 02-A-6735
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, New York 12582

Eldar Mayouhas, Esq.
Assistant District Attorney, Bronx County
198 East 161st Street
Bronx, NY 10451

34